Good morning, Your Honors. Mark Garagos appearing for Mr. Demirdjian. There was a, and I guess I'll start kind of backwards, there was a supplemental authorities that was filed by the Attorney General citing to, I think it was to the Code Section 3051, which for sentencing purposes allows for a, I guess they called it the Youthful Offender Act. Subsequent to that, the case that was cited there and that enactment, last month there was a case, People v. Solis, S-O-L-I-S, out of the Fourth District. Judge Bedsworth, in the opinion there, certified for publication in March, I believe, stated that that does nothing for the facial unconstitutionality of the sentence itself. So I wanted to bring that to the Court's attention as well. You're talking about the Miller issue? Correct. So, but in this case, as I understand it, it wasn't a mandatory life without parole, even though you're arguing that effectively it was? Correct. Originally it was. Judge Conant originally sentenced him to an LWOP. The AG wrote a letter. They brought it back down. At that point, he gave the 50 to life. The case that I just cited, Solis, was almost identical to that. 25 to life, wasn't it? No, this was 50 to life. Two consecutive 25s, so it was 50 to life. You're combining them. Right. That was part of the reason that we made the argument about the life expectancy and everything else. No, I understand. I thought you said 15 to life. No, not 15 to life, 50 to life. 15 to life, I don't know that I would have been making any of the arguments there. If I could go back more to the substantive issue, which was the Griffin and the burden shifting, however, I think that that is an extremely troubling issue. You have a case here where he is a 15-year-old kid. The prosecution's theory concedes that he could not have done this by himself. Their theory, lacking motive and everything else, at the first trial was 8 to 4 for guilt, but 4, obviously, voting for acquittal. How do you get that number, 8 to 4? 8 to 4, how do you know it was 8 to 4? I didn't see that. That's in the record? Right. It was 8 to 4, voting for not guilty. That was in front of Judge Devanin here in Pasadena. And he testified in that case, the defendant did. And then there was a series of machinations where Judge Devanin was, I guess a 170 sub 1 for prejudice was filed. That was disallowed. He recused himself, sent the case to Sam Fernando to Judge Cohen. That trial took place, and the theory still was lacking a motive. You're going to run out of time. Could you address the issue in these cases we always confront? We've got double deference here under IPA. So we have to find both that there was ineffective assistance with all the presumptions in favor of tactics and so on, and then we have to also determine that the state court could not possibly reasonably have concluded that there was anything but prejudicial error here. How do we overcome that? We have been admonished by the Supreme Court many, many times. Well, I think that the procedural history in the state court allows you to get past that kind of double obstacle. First of all, the Court of Appeal opinion, which is the operative opinion because the California Supreme Court denied it summarily, did not even address the issue of the tactics or whether or not it was ineffective assistance to counsel. It was raised. It was not dealt with on the merits. The issue of whether or not there is, we give deference, there was no deference to, or there is no deference to be given because it was never dealt with. So I, procedurally, I don't think that that presents the usual issue that I know you face in most of these cases. Doesn't the Supreme Court require us to think of all conceivable ways, bases, for what the Supreme Court could have ruled when it seemingly has a merits decision? Yes. But in this case, that would be, it would almost be the height of absurdity to get to that point. I don't know how you would get there. Judge, did you ask for an evidentiary hearing below? No. Do we have anything from the attorneys to any sort of strategic reason he possibly could have had for not objecting? We don't. We don't have any of that. Unfortunately, when I got into it, it was already, it was at the COA portion of this proceeding. Judge Noonan, did he have a different lawyer on the second trial? He had the same lawyer on the second trial, Mr. Matthews. Why didn't he take the stand? Why didn't he take the stand? That's a very good question, and one that has not been satisfactorily answered. He did not take the stand the second time around, and then when you combine that, what I was going to get to is when you combine that with the fact of Mr. Barshoff's argument, which was basically why didn't he take the stand, that, I think, is why he was convicted. And remember, it was also, and the record displays, five days of jury deliberations and kind of wrestling with the idea of whether it was aiding and abetting or a principle and things of that nature. It's clear, and I read this whole entire record, it's clear to me someone else was there, that the other people who were there for some reason were never prosecuted. Is that correct? That's correct. I mean, Mr. I think he beat this record, but to me it seems like, and I still cannot figure it out, Mr. Walker seems to be the logical, most likely person to have committed this crime. Mr. Furnish and all of the other evidence that was brought in was probably the one who assisted him, yet there was never any prosecution of Mr. Walker, and Furnish was given immunity, and this young boy, who at the time was 15, ends up getting convicted in this case. And I just don't think that at any point, if either he had taken the stand like he did in the first case, or if his lawyer had objected to that incessant, you're a magician, Mr. Matthews is a magician, Mr. Matthews, smoke and mirrors, Mr. Matthews, why didn't he answer this, why didn't he answer this? It was Claire Griffith there, as far as I'm concerned. It's just whether we get through that AEDPA hurdle is the only issue I have. Well, the – I'm with you in terms of, and with Judge Fischer, in terms of there's no doubt that the Supreme Court has set up a, you know, a series of hurdles that you have to get through, but if you take a look at the State court proceedings, I don't think that we're at a point where anybody has ever dealt with it in any meaningful way such that it would preclude you from acting. And at this point, given the Griffin error, as Judge Wardlaw cites in the – Well, let's assume, I mean, we'll assume there may be Griffin error, but in any event, it seems his strategy was to point to the absent perpetrator here. He had a different – I mean, there were these two Koreans apparently the prosecution had in mind, but his strategy seemed to be to attack the evidence and raise the argument in the jury's mind that it clearly was somebody else, clearly somebody else, and that was his focus throughout, and he even undertook to try to rebut in his argument some of the allegations that the prosecutor said, well, where's the evidence, and so on and so forth. So he clearly had a strategy, and the court at one point even mentioned Griffin as a problem if there was certain commentary. So it's troublesome that what we're looking at is a strategy, that there's no – an evident strategy, and that there's no information from the lawyer as to why or whether he had such a strategy. And I just see that, you know, we can be altogether sympathetic, there are compelling aspects of this case, but I'm having real troubles seeing how we get past the difference. Well, the problem is, and I agree with you, that obviously the strategy, both in trial and in court, is to make the argument that it was somebody else who did it. That strategy is inexplicable when you don't have him take the stand, because the very things that Mr. Barshop and Ms. Doe were pointing to, the prosecutor's position. Well, it's not inexplicable if counsel has some reason to believe that his client isn't going to stand up on the Senate. Except that in this case we have the perfect dry run. We've got the first trial. It's not a perfect – counsel, you know it's never a perfect dry run. You try way too many cases to make that statement. But eight to four for, in this serious of a case, in a double homicide special circumstance case, maybe I overstate when I say perfect dry run, but you do have a dry run where a jury has a cross-examination, four people voted for not guilty, and if you're going to take the same approach in the second trial and not put him up there, you're inviting the jury to speculate why didn't he take the stand, and then as you sit there when the prosecutors, basically the theme of their closing argument is why didn't he do it, why didn't he explain it, why hasn't Mr. Matthews explained it as a proxy for the defendant. That's the part that I say you can't give deference to in terms of it being a strategic decision. It just completely falls apart. But was there anything that happened between the first and the second trial that would explain why he didn't put him on the stand? The cynic in me would say yes, it was the difference between being in trial in front of Judge Devanin and being in trial in front of Judge Cohen. You know, I've known Judge Cohen for many years, but Judge Cohen is a very difficult jurist to deal with. I mean, that can be the only explanation that I can think of for not putting him on the stand, because it's, to my mind, trying these cases and having tried a few of them, there's no way that you can put together a defense and say, I'm going to say some other guy did it. There's clear evidence, and you have to embrace the evidence that he's there, that you can't expect to do that, that type of strategy and not put him on the stand, and then just sit there idly by when the prosecution says, why didn't you put him on the stand, and not make any objection whatsoever. And if the thought was by Mr. Matthews, I'm not going to object because Judge Cohen is going to hammer me in front of the jury or something of that nature, which I know that a lot of practitioners are always leery about objecting or were when he was on the bench. That, I don't think, excuses. That doesn't give you an excuse to just sit there idly by as your client's defense is evaporating in front of you. And then you have the perfect bookend. You have one juror quoted in the Glendale News Press saying, I thought we should have heard from him. And you have another juror telling the law clerk, we wanted to hear from him. We thought we should hear from him. That was the very quote when they walked out of the courtroom. What do we know about the attorney? Was he an experienced attorney? Mr. Matthews is primarily a civil litigator. He's here in Pasadena. He's been practicing for many years. I know him personally. But he is, I would not by any stretch of the imagination say that he was primarily a criminal practitioner. He's got a civil practice, a very vibrant civil practice, but he's not a criminal practitioner. So did you ask for an evidentiary hearing below so that we could maybe? I believe my predecessor did ask for an evidentiary hearing and did not get it. And I don't want to be hung on that, and maybe Mr. Tran knows that. As I stated, I came in at the point where after the district court had ruled and there was no certificate of appealability, and that's when we substituted him. Okay. Okay. Can I ask one last question? Sure. This will be taken over time, but when we're evaluating this, we look at the law at the time, evaluating ineffective assistance, we look at the law as it was at the time of the trial, and we look both at the California standards and to Griffin, correct? Correct. Yes. Yes. I could get into an explanation for the Miller issues because I think that's slightly different. Yeah. No, I'm not presiding here. Well, thank you, counsel. Good morning, Your Honors. Deputy Attorney General Jason Tran on behalf of Respondent. I just want to begin by answering some questions posed by Judge Wardlaw. I don't know if Petitioner's ABS counsel requested an evidentiary hearing, but I am pretty sure that the record does not contain a motion for such a hearing. Well, the reason I'm asking is that I think the Supreme Court also in Martinez has said on some of these cases where they haven't had an evidentiary hearing, for example, we don't know if there was a strategic decision made by Mr. Martinez. Was that the counsel at the time? Mr. Matthews. Mr. Matthews. Made by Mr. Matthews to not object. We have no declaration from him. And in these sorts of situations, the Supreme Court has allowed an evidentiary hearing. That's a more recent case, though. Also, I think that was last year's case. That is correct. However, this Court has decided cases in which this Court held that where there are no declarations from counsel, then Petitioner's claim of ineffective assistance necessarily fails, because we can't speculate as to. But they're saying it's ineffective. Why do they have to have a declaration? They're not the ones that have to bring in a declaration saying, no, there was a strategic reason. Because on habeas it's the burden of proof, and that's why they are the ones to produce declarations from trial counsel if they want to prove that trial counsel is ineffective. And this Court's decisions have held that. And that's cited in my brief. So because of the lack of a declaration, we don't know why counsel did not object to any Griffin error. But as I argued in my brief, counsel may have had a reasonable reason, a good reason not to, and that's not to draw focus on the defense's inability to rebut incriminating evidence. So, but given the lack of any declaration of counsel. But what conceivably could have been a strategic reason for not objecting when you didn't put your client on the stand? Because it would have been, I think, tantamount to an admission that the defense case was indeed weak as accused by the prosecution. Instead. Ginsburg. No, he made those accusations in closing argument. So what I'm saying is he made a decision not to put the defendant on the stand in the second trial for some reason. Clearly, that was a decision that was made. And then once you get you're done, you've closed your case, you're rested, you're in closing argument, and your opposing counsel is arguing that, in essence, that you should have put your, the defendant on the stand because we have all these unanswered things, only he could answer them. What is the, what conceivably is the strategic reason for not objecting at that point? I think the reason, well, I think we have to go back to the reason why counsel did not put Petitioner on the stand as he did at the first trial. Now, we don't know why, but I think based on the fact that the first trial resulted in a hung jury with eight jurors, the majority of the jurors voting to vote guilty to convict Petitioner may have convinced counsel that putting on Petitioner on the stand is not a good idea. And so when he chose not to do so at the second trial and at closing argument when the prosecution pointed to weaknesses in the defense case, I think it was a better or more reasonable tactic for a defense counsel to answer those challenges by the prosecution in the closing argument, challenges that the defense case was weak, and counsel did so in his rebuttal or in his own closing argument rebuttal. No, I thought that was really odd, too, because he started giving, he like fell into the prosecution's theory and started explaining things to the point where the judge almost said that he was going to have to stop talking because he was bringing in stuff that was not in the record, not in evidence, and making explanations about that. And all of a sudden the judge stopped that. Well, counsel, I think, had reasonable grounds to make those arguments despite what the trial court did because counsel's defense theory was that someone else committed the crimes. That Petitioner had nothing to do with the crimes. He was simply a bystander. I thought they said he was there, though. Yes, exactly. He had nothing to do with committing the crimes, but he was present. That was the defense's theory. And so counsel then had, I think, reasonable grounds to argue to the jury that the cuts on Petitioner's hands were caused by playing basketball, and that's totally a reasonable explanation. So I think that by explaining or confronting the weaknesses in the defense case, that made the defense case less weak than simply objecting and saying, Your Honor, I object prosecutors accusing my case of being weak. And that sounds even weaker. So I think counsel made a reasonable decision to confront the prosecutor's accusations head on. But aside from whether Griffin error occurred and whether counsel should have objected to such error, this Court can decide this case much more easily on grounds of prejudice, as Your Honors had indicated earlier. And the record in this case contains overwhelming evidence of Petitioner's guilt. When we have the one of the victims' blood was at Petitioner's house, Petitioner had possession of the other victim's property, specifically a clock and a wallet, and Petitioner discarded those items in a trash can. And the wallet itself, its contents were burnt, including a photo. So that suggests an attempt to prevent identification of the victim. Petitioner himself had in that trash can his bloody shoes, and those shoes contained some bleach. Apparently, there was an attempt to try to wash out the blood. And those shoes matched the shoe prints at the crime scene, the bloody shoe prints at the crime scene. And next to one of those shoe prints are droplets of Petitioner's blood. And so we have, in addition to all that physical evidence, we have the other evidence in this case. Kennedy. Well, you said he conceded he was present. So why are his shoe prints of importance? Because if he were present and did not partake in the murders, then why were there droplets of his blood next to one of the bloody shoe prints? If he were simply there as a bystander, I think a reasonable scenario would be he would stand back and watch in horror or at least try to run off and get help because these victims were supposedly his friends. But instead, we find cuts on his hands, fresh cuts. We find his blood next to the bloody shoe prints. We find his scent on the rock used to kill the victims. Does your office think that there were other people that were present besides DeMargin who were at the scene of the crime as well? There is evidence that before the crimes occurred, there were some Koreans there. But they had a solid alibi because at the time of the crimes, they were in Palm Springs. So Petitioner himself, the defense case, conceded that those were not suspects. So what about this Adam Walker? Right. Adam Walker was the only viable suspect, it turned out. And that was the entire defense case, was that Adam Walker did it. No one else but Adam Walker did it. The problem with that theory is that Adam Walker did not have any cuts or bruises on his hands a couple of days after the murders when the police arrested him. There was no blood on his clothing. There was a witness that testified that Adam Walker was with the group of people, including herself, through the night of the murder. And the next morning, he woke up in the same clothes that had no blood on them. There was no change of clothing either. So Adam Walker, as the jury apparently concluded, was not a viable suspect in this case. And finally, I want to conclude. One more, I think, strong and incriminating piece of evidence is the poem and the photograph downloaded by Petitioner just one day after the murders, describing the exact manner of killing that was One day after the murders? Yes, shortly after the murder. I mean, would it be more probative if he downloaded it before the murders? That's true. However, I think the fact that it was downloaded one day after the murder is still probative of at least consciousness of guilt. And the poem and both the photograph shows the victims being bashed in the head with a rock and also being strangled. And we have evidence of such manners of killing in this case. So that's the court. Oh, I want to conclude one more by making one more comment about the second issue, the Miller issue. As Your Honor, Judge Hortler had commented, the fact is Petitioner received individualized sentencing in this case when the trial court exercised its discretion not to impose a more lenient sentence. And that is all that Miller requires. What about 3501? Counsel has cited the Solis case. Does that eliminate 3501 as a factor in our analysis of whether this is effectively a life sentence? It could moot the issue. However, this issue is now before the California Supreme Court on review. And so the state courts are debating the very questions that we are asking today. However, if this court desires, this court can interpret 3051 for itself. It plainly reads that a juvenile gets a parole hearing at the 25th year of incarceration. So that would appear to moot the issue. However, the easier route, I believe, is to simply conclude Miller was never violated in this case due to individualized sentencing, as Judge Hortler commented. So unless this court has any further questions, I'm prepared to submit the matter. So you're saying that the 25 years that this statute would, on its face, provides to moot the privilege with a parole hearing, 25 years from the date of conviction? Correct. No, date of sentencing. Date of sentencing. And when would that be? Petitioner would be 41 years old. But what year would that be? We're in 2014 now. What year would that be? Okay. So he was sentenced, I believe. I don't have the exact date he was sentenced, but he was 16 years old, I know, at the time he was sentenced. Yeah, so 16 years old. Maybe the opposing counsel has a date. I believe he was sentenced in 2001, so it would be 25 years from 2001, 2026. Okay. Thank you. Thank you. I can just start from backwards first. As Judge Bedsworth said in the Solis case, the fact that there is the existence of the statute as a safety net does not do anything about the facial unconstitutionality of the sentence itself, number one. Number two, more importantly, who knows what crime is going to be committed, which will be the scandal du jour, which will let our legislature repeal that sometime. We have to hope that that statute sits there until the date that he's eligible, which by its own terms, the statute is not. It sunsets well before that date. So that in and of itself, as Judge Bedsworth says, it's not my language. He says there's no reason in the world to accept the argument that it moots it. As far as the Adam Walker situation and the facts here, you know, as Judge Wardlaw mentioned, the fact is, is that the download that they talk about was afterwards. What they don't talk about is that Adam Walker himself reported these murders before, seven hours before the murders were publicly reported. And then the prosecution's answer to that was, oh, the witness who says he said that, I must have gotten confused on my days because I was doing LSD mushrooms and something else. So that hardly informs the situation. And you combine that with the fact that the juror questions in trial number two focused on ater and abetter and things of that nature, because the jury, no juror, I don't think ever thought that this gentleman, this young man, was the principal. And strategically, answering Mr. Tran's argument about there must have been some bar shop does the opening of the closing. Truck Doe does the closing, the reply. Well, he sat through bar shop. As bar shop committed Griffin error and burden shifting the entire time, he didn't utter a peep. He gets up there and does kind of this four-hour stream of consciousness, for lack of a better term, which, you know, maybe is great if you're in a civil case and you want to try and set the tone for the jury on the more probable than that. But then he sits down. He knows, or he should know, maybe had a flashback and thought he was civil in a civil courtroom and he could get up again and assert reply. But he doesn't object once when Truck Doe does the same thing in the reply argument. So there is no basis for what Mr. Tran says, that it could have been strategic. How could it be strategic when you're never going to get to address the jury again to allow Truck Doe to just continue the same theme that was started by Mr. Bar Shop? I would embrace if Your Honor feels like a remand for an evidentiary hearing would make sense in this, and I'd embrace this and obviously encourage and hope that the court would do that. But I think on the record itself right now that it could be reversed, but I don't want to be so presumptuous. All right, counsel. Thank you very much. Does anyone have any other questions? No. Okay. All right. This case will be submitted.
judges: Noonan, Wardlaw, Fisher